IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MARTHA E. LUNA,            §
                         §
      Plaintiff,            §
                         §
V.                       §       CIVIL ACTION NO. H-05-533
                         §
JOANNE B. BARNHART      §
COMMISSIONER OF THE SOCIAL   §
SECURITY ADMINISTRATION,     §
                         §
      Defendant.          §

**MEMORANDUM AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Before the Court in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 13), Defendant's Motion for Summary Judgment (Document No. 14), and Plaintiff's Reply thereto (Document No. 15). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Court ORDERS, for the reasons set forth below, that Plaintiff's Motion for Summary Judgment (Document No. 13) is DENIED, Defendant's Motion for Summary Judgment (Document No. 14) is GRANTED, and the decision of the Commissioner is AFFIRMED.

**I. Introduction**

Plaintiff Martha Luna ("Luna") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her applications for

disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  According to Luna, substantial evidence does not support the ALJ's decision, and the ALJ, Janis Estrada, committed errors of law when she found that Luna has the residual functional capacity ("RFC") for sedentary work, and that Luna's medical-vocational profile corresponded with Rule 201.23, Appendix 2, Subpart P, Regulations No. 4.    (Tr. 32).   Luna seeks an order reversing the Commissioner's decision and awarding benefits, or in the alternative, an order remanding her claim for further proceedings.  The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Luna was not disabled as a result of her impairments, that the decision comports with applicable law, and that it should therefore be affirmed.

## II.  Administrative Proceedings

On January 6, 2000, Luna applied for disability insurance benefits and supplemental security income benefits claiming that she has been unable to work since July 10, 1997, as a result of  low back pain and a history of back surgery.  (Tr. 26, 63-65, 69, 81).    The Social Security Administration denied her applications at the initial and reconsideration stages. (Tr. 35-66).  After that, Luna requested a hearing before an ALJ.  The Social Security Administration granted her request and the ALJ  held a hearing on June 20, 2001 (Tr. 251-273), at which Luna's claims were considered *de novo*.  On August 21, 2001, the ALJ issued her decision finding Luna not disabled. (Tr. 26-33).  The ALJ found at step one that Luna had not engaged in significant gainful activity since her alleged disability onset date.  The ALJ found that Luna had a severe impairment, degenerative disc disease (status post spinal surgeries in January 1998 and June 1999).  The ALJ further considered whether Luna met a Listing.  To satisfy a listing for a vertebrogenic disorder,

there must be objective medical evidence of pain, muscle spasm, significant limitation of motion of the spine and appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.  Here, the ALJ found that because Luna had no neurological deficits, she did not meet the listing for a vertebrogenic disorder.  Next, at step three, the ALJ found that Luna's impairment was not severe enough to meet or equal any of the listed impairments in the Social Security Regulations, which would require a finding that she was disabled.  At step four, the ALJ concluded that Luna retained the residual functional capacity ("RFC") to perform work at the sedentary level.  The ALJ further concluded that Luna could not return to her past relevant work.  At step five, based on Luna's vocational profile, the ALJ, applying the Medical-Vocational Guidelines grid rule 201.23, concluded Luna was not disabled within the meaning of the Act.

Luna sought review by the Appeals Council of the ALJ's adverse decision.  Because the hearing tape was missing, the Appeals Council vacated the ALJ's decision and remanded the case for a new hearing.  (Tr. 20-22).  In the interim, because the hearing tape was located, the Appeals Council vacated its previous order and considered Luna's request for review of the ALJ's decision.  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest.  20 C.F.R. § 404.970, 416.1470.  After considering Luna's contentions in light of the applicable regulations and evidence, the Appeals Council concluded, on January 27, 2005, that there was no basis upon which to grant Luna's request for review.  (Tr. 4-6).  The ALJ's findings and decision thus became final.  Luna has timely filed her appeal of the ALJ's decision.  42 U.S.C. § 405(g).  The Commissioner has

filed a Motion for Summary Judgment (Document No. 14), and Plaintiff has filed a Motion for Summary Judgment (Document No. 13).   Luna has filed a Reply to Defendant's Motion for Summary Judgment.  (Document No. 15).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 273 (Document No. 10).  There is no dispute as to the facts contained therein.


### III.  Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits is only: "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "The findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."   The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.  42 U.S.C. § 405(g).   While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh  the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve.  *Anthony v.*

4

*Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques.  42 U.S.C.  423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him,

or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one

is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in

any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting

*Milam v. Bowen*, 782 F.2d 1284 (5th Cir. 1986).

> The Commissioner applies a five-step sequential process to determine disability status:
>
> 1.  If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2.  If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;
>
> 3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;
>
> 4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
>
> 5.  If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren*

*v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden

of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the

burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.

*McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that

other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v.*

*Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner

determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 563.

Here, the ALJ found at step five that Luna could perform sedentary work.  Then, based on

Luna's age (42), limited education (6th grade education in Guatemala and cannot speak English), work experience (as an assembly line worker at Igloo Corporation), and relying on the testimony of a vocational expert, and applying the Medical-Vocational Guidelines (the "grid rules"), the ALJ concluded that Luna was not disabled.   In this appeal, the Court must determine whether substantial evidence supports the ALJ's step five finding.   According to Luna, substantial evidence does not support the ALJ's decision.   Luna argues that ALJ failed to fully develop the record.   According to Luna, the ALJ erred in not having a medical advisor testify at the hearing.   Luna contends the ALJ lacked sufficient medical comprehension to evaluate the severity of her impairments and functional capacity.   Further, Luna argues the ALJ erred in developing the record by failing to order a consultative psychological evaluation because the medical records showed Luna's physical impairments had a strong psychological underpinning.   According to Luna, the ALJ misunderstood the term "functional overlay" and mistakenly equated the term with malingering and exaggeration. The Commissioner responds that the ALJ's decision is supported by substantial evidence and that she correctly applied the law.   With respect to Luna's impairments, the Commissioner responds that the ALJ clearly understood the concept of "functional overlay" as referenced in the medical records, and found that Luna was exaggerating her pain and was not credible.   In addition, the Commissioner argues that based on the medical records, the ALJ did not abuse her discretion by not ordering a consultative psychological evaluation or utilizing the services of a medical advisor at the administrative hearing.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence of

pain as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's

educational background, work history, and present age.  *Wren,* 925 F.2d at 126.  Any conflicts in

the evidence are to be resolved by the ALJ, and not the Court.  *See Newton v. Apfel*, 209 F.3d 448,

452 (5th Cir. 2000) (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).


## V.  Discussion

### A.  Objective Medical Evidence

The medical records show that Luna injured her back while working at the Igloo Corporation

and has complained of and been treated for degenerative disc disease and has undergone two back

surgeries.

The record shows that Dr. Homero Anchondo, in response to Luna's complaints of leg pain

and hip pain, ordered a MRI of the spine-lumbar.  Luna underwent the procedure on August 19,

1997.  (Tr. 102).  The MRI revealed that Luna had a "1.  Diffuse disc bulge at L4-L5 and L5-S1

without evidence for frank herniation" and "2.  Spondylosis and disc desiccation at L4-L5 and L5-

S1."  (Tr. 102).

On September 17, 1997, Luna underwent a electromyograpy study over the right and left

lumbosacral paraspinals and both lower extremities and a nerve conduction study.  According to

Pedro Guana, M.D., the result of the nerve conduction study was "considered essentially negative."

(Tr 87).

An MRI of Luna's right hip was performed on October 13, 1997.  (Tr. 91-92).  The MRI

showed "minimal nonspecific right hip joint effusion."  (Tr. 91).  A second MRI of the hip was

performed on October 17, 1997.  The results of the MRI were "essentially unremarkable."  (Tr. 90).

Similarly, Luna had an "essentially unremarkable MRI of the pelvis with particular attention to the sciatica nerve region." (Tr. 88-89).   In connection with Luna's complaints of low back pain and lower radicular pain, she had a lumbar myelography on November 18, 1997. (Tr. 95-96).  Dr. Bruce A. Cheatham reviewed Luna's results and opined:

    1.  Five non-rib bearing vertebrae in usual lordotic alignment.

    2.  T12-L1, L1-L2, and L2-L3: No significant abnormality.

    3.  L3-L4:  Moderately prominent anterior extradural impression of 5 to 6 mm.

    4.  L4-L5:  Large right foraminal or lateral extradural impression that measures 2.0 cm vertically and 1.5 cm in transverse diameters.  There is associated non-filling or truncation of the right L4-L5 nerve rootlet sleeve.  Also, vaguely-demarcated sizable anterior extradural impression of 6 to 7 mm.

    5.  L5-S1:  Smoothly demarcated 5 to 6 mm anterior extradural impression, but symmetric bilateral nerve rootlet sleeves distention.

    6.  Unremarkable appearance of spinal cord conus posterior to L1.

    7.  No significant further examination abnormality.  (Tr. 96).

In connection with the imaging of Luna's spine, a computed tomography of the lumbar spine, post intrathecal contrast enhancement was performed.  (Tr. 93-94).  Based on the test results, Dr. Cheatham opined:

    1.  Five non-rib bearing lumbar vertebrae in usual lordotic alignment.

    2.  T12-L1 and L1-L2:  No significant CT or myelographic abnormality.

    3.  L2-L3: Minimal degree symmetric annular bulge with uniform excursion of the annulus of approximately 2 mm.  No substance protrusion or herniation.  No definite myelographic abnormality here identified.

    4.  L3-L4:  Mild degree symmetric annular bulge with uniform and smoothly demarcated excursion of the annulus of 4 to 5 mm.  No focal substance protrusion or herniation.  Myelography concurs.

5.  L4-L5: Large right paracentral and foraminal discal substance protrusion or herniation with posterior substance excursion of at least 8 mm over a 2.0 cm diameter base.  Such narrows right AP foraminal diameters by at least 70%. Otherwise, in central, left paracentral and foraminal areas, mild degree annular bulge with smoothly demarcated excursion of the annulus of 4 to 5 mm.  Myelography concurs and additionally suggests a lateral or focal area of discal substance protrusion measuring 2.0 cm vertically and 1.5 cm transversely within the right foraminal area with additional complete truncation of the right nerve rootlet sleeve in this location.

6.  L5-S1: Large, posterior central, bilateral paracentral, and right foraminal discal substance protrusion or herniation with posterior substance excursion of 6 to 7 mm over a 3.5 cm diameter base.  Such narrows right AP foraminal diameters by 50 to 60%.  Myelography concurs.

7.  No significant further examination abnormality.  (Tr. 94).

Luna's insurance carrier referred her to Homero Anchondo, M.D., for an independent medical opinion.   This was not the first time that Luna had been examined by Dr. Anchondo. According to Dr. Anchondo's May 20, 1998, letter to the insurance carrier, he had seen Luna in 1997 for her "chronic complaints of lower back pain with radiation to the right lower extremity." (Tr. 99).  Dr. Anchondo summarized his treatment of Luna in 1997 and subsequent examination as follows:

As you remember, I had the opportunity of seeing this lady in 1997 because of chronic complaints of lower back pain with radiation to the right lower extremity. The patient's initial studies did not show a significant pathology.  The patient did not improve with any conservative measures.  I have recommended she be evaluated in a pain clinic.  The patient, during her examination, had quite a bit of functional overlay in all of her symptoms.

The patient states that she decided to go to another physician.  The patient was evaluated and further studies were conducted.  Apparently, she was found to have a herniated disk at L4-L5 level.  Eventually, she had a surgical procedure with hemilaminectomy and disk excision at L4-L5 and L5-S1.  The patient states that the surgical procedure, instead of making her better, has made her worse.  She has had pain involving the back and the entire right lower extremity.  She has pain and numbness and the entire right lower extremity.  She has pain and numbness in the right upper extremity, as well.  She states that medical treatment has not improved

10

the problem and states that she cannot do any physical activities.  (Tr. 99).

Dr. Anchondo performed a physical and a neurological examination of Luna.  With respect to the results of Luna's physical examination, Dr. Anchondo wrote:

> It was immediately evident that the patient continues to show significant functional overlay.  Her gait was felt to be within normal limits in the waiting room; however, in the hallway, on the way to the examining room, once she made it to my examining room she began to move very slowly and explained that she had quite a bit of pain, even to walk to sit on the examining table when I asked her to sit.  On examination, I found a well healed, very long scar in the lumbar area from the laminectomy.  There was no evidence of inflammatory changes.  There was no evidence of any abnormalities but the patient complained of intense pain, even to light touch of the area.  Lasegue was negative to 90 [degrees]; however, the patient complained of pain with any motion of the extremity.  (Tr. 100).

As to the results of Luna's neurological examination, Dr. Anchando wrote:

> **Higher cerebral functions:**  Normal. **Cranial Nerves:**  Normal. **Motor Systems:** I could not detect any weakness, atrophy, or fasciculations; however, the patient did not make any effort to flex or extend the foot, knee, or hip on the right side.  She stated that because of the intensity of the pain she could not. **Reflexes:**  Perfectly normal in the upper and lower extremities.  2+ and 3+.  No Babinski or colonus. **Sensation:**  Examination of the sensations were very bizarre.  I did the examination several times and asked the patient to be truthful about it.  She continued to express that there was decreased sensation to pinprick in the entire right leg, in the right side of the chest and abdomen.  On the right upper extremity, the right side of the face, and on the right side of the skull.  When I did the vibration sense, there were the same findings.  The patient stated that she could not feel the vibration in the right side or in the leg, in the foot, in the arm, in the face, or in the right side of the skull. **Cerebellar Functions:**  Completely normal.
>
> In my opinion, Ms. [Luna] had so much functional overlay, and in my opinion most likely malingering, that the findings on the examination were not possible from a neurological point of view and did not have anything to do with her problems of the lumbar spine.  I confronted her with these findings and I explained that in my opinion she should desist of doing this because it may harm her in the future if some other physician believes her and tries to do something to correct a pathology that cannot be present.
>
> It is my impression that the patient has reached maximal medical improvement from any pathology that she had.  She showed signs of severe functional overlay even before her surgical procedure, and obviously after the surgical procedure, the

11

symptoms are worse.  This type of patient in general will not get better and the more aggressive the treatment, the more intense the symptoms are going to be.  Most likely, in her mind, she will never recover fully from this injury.

If anything, the patient may benefit from a complete psychological evaluation and help in that department.

You requested an evaluation of permanent impairment; however, I will have to decline to do this evaluation on the basis that the findings on this patient are so bizarre that most likely the evaluation would be completely invalid secondary to the functional observation and I would prefer for her to be sent to another physician for such an evaluation so one more opinion can be given; and besides that, the patient can be given one more opportunity of expressing the true symptoms that are present at this time instead of all these changes that she was telling me were present at the time of my examination.  (Tr. 101).

Luna was examined by Dr. Robert W. Koshman on August 28, 1998.  (Tr. 218).  According to Dr. Koshman, Luna was not in acute distress.  (Tr. 219).  Luna had a "markedly decreased range of motion.  Forward flexion, rotation, and lateral flexion are all reduced probably 60 [degrees] or 70 [degrees].  [S]he has spasm in the iliolumbar region bilaterally.  Hip motions are normal.  Neurologically the lower extremities are grossly intact.  Sitting root is negative bilaterally".  (Tr. 219).  In addition, the x-rays showed no acute changes.  Based on Dr. Koshman's physical examination, along with his review of Luna's previous treatment notes and x-rays, he recommended that Luna undertake aggressive treatment, and he prescribed Naprosyn, and Ultram for pain management.  (Tr. 219).

Next, Luna was seen by Dr. Koshman on October 9, 1998.  (Tr. 217).  According to Dr. Koshman's treatment note, Luna's status was unchanged.  (Tr. 217).  Luna returned for a follow up appointment on November 6, 1998.  (Tr. 217).  Again, Dr. Koshman wrote that Luna was "unchanged", was taking two Ultram per day, and had "marked limitation of motion."  (Tr. 217).  Luna's condition was basically unchanged at her subsequent office visits on January 19, 1999, and

February 17, 1999. (Tr. 217). The next series of medical records relate to Luna's back surgery in

February 1999 by Dr. Koshman. (Tr. 103-109). A pre-surgery MRI showed "moderate chronic

degenerative change of the nucleus pulposus of L4-5 and L5-S1" and "[s]mall right posterolateral

focal disc protrusions at both L4-5 and L5-S1 compressing the patient's right L5 and S1 nerve roots,

respectively." (Tr. 109). In Dr. Koshman's notes from his pre-surgery examination of Luna, he

described Luna as being in "no acute distress." (Tr. 106). Dr. Koshman wrote:

> Back: On examination of her back, she has a large midline scar in the low back area
> with markedly decreased range of motion. Forward flexion, rotation, lateral flexion
> are all reduced to 60-70 [degrees]. She speak[s] only Spanish, and I speak only
> English, and it is difficult to communicate with her, but she appears to have pain
> throughout her lower back.

> Neurologic: The lower extremities appear grossly intact, although it is difficult to
> assess. Sitting root is negative bilaterally. All records indicate that she has disc
> problems at L4-5, and L5, S1, with persistent evidence of pressure on the nerve roots
> on the right side, and L5 and S1 on the right side. (Tr. 107).

Based on Dr. Koshman's diagnosis of sciatica, right and lumbar disc herniation at L4, 5 and L5, S1,

Luna had a hemilaminectomy, disk excision of L4-5 and L5-S2, two levels with foraminotomies and

excision of recurrent disk. (Tr. 103).

At Luna's next appointment on April 9, 1999, Dr. Koshman reviewed an MRI of Luna's back

that showed "two small disc herniations at two levels, presumably the levels that were done. There

is still some pressure on the nerve root. The S1 nerve root is affected  Clinically she has markedly

reduced range of motion." Based on these findings, Dr. Koshman opined: "there is probably a

functional overlay, but she does have anatomic changes on the MRI." (Tr. 216). Because Luna

previously had problems in the disks at issue, she was referred to Dr. Anchondo for follow-up

opinion. On May 5, 1999, Luna returned to Dr. Koshman, having previously been examined by Dr.

Anchondo. With respect to Dr. Anchondo's findings, Dr. Koshman wrote: "She does not really like

13

Dr. Anchondo very much, but his opinion concurs with mine that there is functional overlay.  This lady is very tentative and afraid of moving her back.  However, she does have evidence of disc herniations at two levels."  (Tr. 216).

On June 17, 1999, Luna underwent a second laminectomy.  Luna was seen by Dr. Koshman on June 29, 1999, at which time her staples were removed and the incision looked good.  (Tr. 215).  At her next appointment on July 21, 1999, Luna was "still very reluctant to move her back.  She has mild tenderness in the low back area."  (Tr. 214).  Luna was next seen by Dr. Koshman on September 3, 1999. (Tr. 214).  According to Dr. Koshman, Luna had "reached maximum recovery.  She has marked limitation of motion.  I still think that there is considerable functional overlay here, but was assessed as having 17% permanent physical impairment."  (Tr. 214).  Finally, Luna was seen by Dr. Koshman on January 12, 2000.  (Tr. 212).  According to the treatment note, Luna had "a markedly reduced range of motion with spasm in the paravertebral muscles.  Neurologically she has no indication of any radiculopathy."  (Tr. 212).  Based on these findings, Dr. Koshman prescribed Medrol Dosepak, and Ultram, and she was referred to Dr. Charnov for possible pain control.  (Tr. 213).

The next series of records are from Luna's physical therapy at the Work Ready Rehabilitation Centers from August 3, 1999 to September 24, 1999, following her back surgery.  (Tr. 110-117).  At her initial intake evaluation on August 3, 1999, Luna described her present avocational activities as "primarily remaining at home" and "walking during her free time."  (Tr. 116).  The test results show that Luna had all negative responses to Waddell's Testing.  (Tr. 116).  Based on the results of the examination, which the evaluator considered to be valid, the evaluator opined that Luna had "good strength in upper extremities and left lower extremity. Fair to fair plus in right lower

extremity." (Tr. 117). In contrast, Luna had "decreased strength in trunk and right lower extremity" as well as "increased muscle spasm in lumbar paraspinals" and "decreased trunk range of motion." (Tr. 117). Luna attended all scheduled therapy sessions, and showed improvement with lumbar flexion, right lateral flexion, left lateral flexion, right SLR and left SLR. (Tr. 113). According to the August 13, 1999, progress note, Luna had "good motivation and effort with all assigned activities when present." (Tr. 113). Similarly, the progress notes for the next two week period dated August 20, 1999, again reveal that Luna "showed significant improvement in all planes of lumbar motion." (Tr. 111). Notwithstanding this improvement in lumbar motion, Luna was "extremely pain focused and apprehensive when performing the exercise program. She has a lot of difficulty with the assigned activities and is unable to tolerate the prone position." (Tr. 111).

The medical evidence further shows that Luna was treated at the Doctors Hospital-Parkway from October 17, 1999 to October 22, 1999 for an abscess of the left lower quadrant of the abdominal wall secondary to methicillin-resistant Staphylococcus aureus. (Tr. 118-211). Luna was treated with antibiotics and on discharge was instructed on wound care.

In connection with Luna's applications for benefits, she was referred to Donald Gibson II, M.D, an internist, for an evaluation. (Tr. 220-223). This examination was performed on April 18, 2000. Luna had "forward flexion of 30 degrees, extension 10 degrees, and right and left opening 10 degrees. Straight leg raise on the right was positive at 60 degrees and left at 55 degrees. Heel to toe and tandem were fair. Squat was poor." (Tr. 222). Neurologically, Luna had no deficiencies. (Tr. 222). Dr. Gibson noted: "motor and sensory are intact. Gait and coordination are normal. Deep tendon reflexes are two plus and symmetric. There is no localized sensory loss, muscle weakness, or atrophy. Cranial nerves two through twelve are intact. Gross mental status is normal."

15

(Tr. 222).  Likewise, Luna had no abnormal findings concerning her extremities. (Tr. 222).   There

was "no clubbing, cyanosis, or edema.  Peripheral pulses are two plus and intact.  Peripheral joint

exam reveals all joints have full range of motion.  There is no warmth, effusion, or deformity."(Tr.

222).  Also, Dr. Gibson reviewed lumbar spine x-rays, which indicated that Luna had spondylosis

at L5 with narrowing of the L5-S1 disc space and post laminectomy changes.  There is a normal

lordotic curve of the lumbar spine.  Vertebral height is normal."  (Tr. 222).  Based on the results of

his examination of Luna and review of the x-rays, Dr. Gibson opined as follows:

> 1. <u>Back Pain</u>.  Patient has chronic back pain syndrome with severe limitation of
> movement, muscle spasms and possible radiculopathy or herniated disc.  She will not
> be able to bend and lift even on a light basis and will have difficulty with walking,
> standing, and other ambulatory activities.  The patient should be considered for
> chronic pain therapy including TENS unit or dorsal root stimulator.  Patient's
> condition is not expected to improve.  She has reached maximum medical
> improvement.  She should continue stretching and physical therapy.  (Tr. 222)

A DDS physician completed a Residual Functional Capacity Assessment-Physical on April

25, 2000.  (Tr. 224-231).   According to the assessment, Luna had no manipulative, visual

communicative, and environmental limitations, could occasionally lift and/or carry 50 pounds,

frequently lift and/or carry 25 pounds, stand and/or walk about 6 hours in an 8 hour workday, sit

about 6 hours in an 8 hour workday, could push/pull, and could frequently climb, balance, kneel,

and crawl and occasionally stoop and crouch.  (Tr. 225-226).

Lastly, Luna was referred by Dr. Koshman for a Functional Capacity Evaluation.  That

evaluation was conducted by the Work Ready Rehabilitation Center on May 17, 2001.  The report

shows that Luna reported that "her current schedule consists of primarily remaining at home.  She

states that she enjoys light exercise and walking during her free time."  (Tr. 242).  In connection

with the evaluation, several tests were administered to Luna including grip strength, sitting,

16

standing, crawling, climbing, reaching, manual muscle test, and Waddell's testing. The Waddell test was positive for tenderness, simulation, and overreaction. It was negative as to distraction and regional. (Tr. 243). Also, the evaluator measured Luna's functional strength testing. (Tr. 243). Based on the testing, the evaluator concluded that Luna was currently functioning at a sedentary physical level. (Tr. 244). With respect to consistency and validity, the evaluator wrote: "[i]nvalid grip strength testing. Cogwheeling with minimal muscle testing. Displayed three of five positive Waddell's signs for non-organic symptoms." (Tr. 244). No range of motion deficits were noted. Overall, the evaluator made the following recommendations:

> Patient displayed several inconsistencies on her functional testing. Her heart rate responses do not correlate with her pain complaints. She does not display the ability to perform any form of work. She may benefit from a pain management program. (Tr. 245).

In addition, the licensed physical therapist who performed the work functional evaluation completed a form entitled "Physical Residual Functional Capacity Questionnaire." (Tr. 246-250). The physical therapist wrote: "patient is limited primarily by pain limiting behavior. She appears to be exhibiting symptom magnification behavior." (Tr. 246, 250). Similarly, in response to the question: Is your patient a malingerer?" The physical therapist responded: "unknown but possibly yes." (Tr. 247). In addition, the physical therapist affirmatively responded that emotional factors could contribute to the severity of Luna's symptoms and functional limitations. (Tr. 247).

In this case, upon this record, the objective medical evidence factor supports the ALJ's finding that Luna had the residual functional capacity to perform sedentary work. The ALJ did not err by failing to develop the record by not having a medical advisor assist at the administrative hearing or by ordering a consultative psychological evaluation as the circumstances in the instant action did not require the ALJ to utilize a medical advisor or request a consultative examination.

A medical advisor is a neutral advisor who renders expert opinion based solely on medical records and evidence. *See Richardson*, 402 U.S. at 408 (1971); 20 C.F.R. § 1512(b)(6), 404.1527(f). There is no requirement that the ALJ *must* use a medical advisor. *See Richardson*, 402 U.S. at 408 (recognizing that medical advisors could, but were not required to be used in explaining complex medical problems to the examiner); *Haywood v. Sullivan*, 888 F.2d at 1467 ("An ALJ requests a [medical advisor] to testify when she or he feels it necessary."). The Social Security regulations only require that medical advisors be used in certain circumstances. For instance, an ALJ must seek the opinion of a medical advisor when the ALJ concludes that the claimant does not meet the specific criteria outlined in the listings but reasonably believes that the claimant's impairments may be judged equivalent. Also, the ALJ must use a medical advisor where the ALJ receives additional medical evidence that the ALJ believes may change the "State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairments in the listings." SSR 96-6p. In addition, the ALJ must use a medical advisor when establishing the onset date of disability for slowly progressive impairments where the date the claimant became disabled is ambiguous. *See Spellman v. Shalala*, 1 F.3d 357, 363 (5th Cir. 1993); SSR 83-20. Because none of the circumstances requiring medical advisor testimony were present, the ALJ was not required to request medical advisor testimony. Upon this record, the ALJ had no reasonable belief that Luna's impairments were medically equivalent to a listing or that the additional medical evidence would change the state medical agency's determination that Luna did not meet or equal a listed impairment. It is undisputed that the clinical, radiological and medical findings show disc changes, overall she exhibited a reduced range of motion, and she was given a 17% impairment rating by her insurance carrier. However, the medical records from Luna's examinations also show that Luna was

18

neurologically intact, had no muscle weakness, or sensory or reflex loss.  The records support the ALJ's finding that Luna's symptoms were disproportional to her complaints of debilitating pain.

Likewise, the ALJ did not err in not ordering a psychological evaluation.  There was no sufficient justification for the ALJ to order a consultative mental status evaluation.  It is the plaintiff, not the ALJ, who has the burden of proving her disability.  *Haywood v. Sullivan*, 888 F.2d 1463, 1472 (5th Cir. 1989), (citing *Scharlow v. Schweiker,* 655 F.2d 645, 649 (5th Cir. 1981)).  The ALJ has discretion to order a consultative examination at government expense, *Jones v. Bowen*, 898 F.2d 774, 778 (5th Cir. 1987), but is not required to do so unless the plaintiff carries her burden of raising "the requisite suspicion" that the examination is "necessary" to discharge the ALJ's responsibility to conduct a full inquiry into the facts.  *Haywood v. Sullivan*, 888 F.2d at 1472 (quoting *Pearson v. Bowen*, 866 F.2d 809, 812 (5th Cir. 1989)). Luna did not allege in her disability applications that she was disabled as a result of a mental impairment and did not testify at the hearing about a mental impairment.  The only suggestions of psychological problems appear to be Dr. Anchondo's suggestion that Luna *may* benefit from a psychological evaluation, and the physical therapist's response in the form entitled "Physical Residual Functional Capacity Questionnaire," that emotional factors could contribute to the severity of Luna's symptoms and functional limitations (Tr. 247).  However, the physical therapist also stated that Luna might be a malinger.  (Tr. 247).  In addition, Dr. Anchondo, however, did not refer Luna for a psychological evaluation or specify that such an evaluation *must* take place.  Moreover, in his overall assessment of Luna's condition, Dr. Anchondo did not explicitly or impliedly diagnose a mental impairment.  Rather, he opined that Luna was "most likely malingering".  (Tr. 101).  Moreover, Dr. Koshman's records show that he too, based on his medical training, opined Luna had a functional overlay and expressly stated he concurred with

19

Dr. Anchondo's conclusions. (Tr. 216).   Also, none of the other treatment notes mention that Luna had an altered mental state or reference a possible psychological problem.  Lastly, Luna's reported daily activities to the physical therapist such as walking and staying home, do not suggest a mental impairment.  Based on the objective medical evidence, the Court does not find that the ALJ's failure to order a consultative examination constitutes inadequate development of the record.  In a situation such as here, of repeated and consistent references to functional overly by Luna's examining physicians, the ALJ had to distinguish between legitimate mental impairments and physical symptoms and symptoms that were are consciously exaggerated in an effort to avoid working and acquire DIB and SSI benefits.  *Brown v. Bowen*, 863 F.2d 336, 338 (5th Cir. 1988).  Given the statements by Dr. Anchondo, who treated Luna in 1997 and 1998, and by Dr. Koshman, who saw Luna on at least ten office visits, concerning functional overlay, and the physical therapist's evaluation, the record supports the ALJ's finding of pain exaggeration on the part of Luna.[1]  "The ALJ's duty to investigate ... does not extend to possible disabilities that are not alleged by the claimant or to those disabilities that are not clearly indicated on the record."  *Legett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995).  Indeed, isolated references to a possible mental impairment are not enough to warrant a consultative psychological examination.  *Id.*  Based on the objective medical evidence, the ALJ's failure to order a consultative psychological evaluation does not constitute inadequate development of the record.

---

[1] To the extent the Luna argues the ALJ misunderstood the clinical significance of Waddell signs because the ALJ noted that Luna had three positive Waddell signs, according to the Attorney's Medical Deskbook 3d § 11.2 (2003)(Westlaw.com at "MEDDESK"), the presence of three or more findings is "usually considered sufficient to make a diagnosis of functional disorder or deliberate deception (malingering) and rule out physical abnormality."  As such, the ALJ's reference to the positive Waddell signs was not error.

### B.  Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'"  *Newton v. Apfel,* 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez,* 64 F.3d at 176).  As such, if the treating physician's opinion is deficient in either respect, then it is not entitled to controlling weight.  The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists.  *Id.*  "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez v. Chater*, 64 F.3d 176 (5th Cir. 1995) (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).  Further, regardless of the opinions and diagnoses of medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).

Even if an opinion of a treating physician is not entitled to controlling weight because it was not consistent with the other substantial evidence of the record and was not well supported by medically acceptable clinical and laboratory diagnostic techniques, the opinion nonetheless is still

entitled to deference and must be weighed in light of the following factors:

> (1)  the physician's length of treatment of the claimant,

> (2)  the physician's frequency of examination,

> (3) the nature and extent of the treatment relationship,

> (4)  the support of the physician's opinion afforded by the medical evidence of the record,

> (5)  the consistency of the opinion with the record as a whole, and

> (6)  the specialization of the treating physician.

*Newton*, 209 F.3d at 456.

Here, the thoroughness of the ALJ's decision shows that she carefully considered the medical records and testimony, and that her determination reflects those findings accurately.  The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources, including the physical therapist.[2]  The ALJ wrote:

> The undersigned considered the Functional Capacity Evaluation and Physical Residual Functional Capacity Questionnaire in which a physical therapist concluded that the claimant could sit less than 2 hours of a workday, stand/walk less than 2 hours of a workday, lift less than 10 pounds frequently, and never lift 10 pounds (Exhibit 13F).

---

[2] The medical opinions of a physical therapist are not entitled to controlling weight under the statutes.  "Sources who can provide evidence to establish an impairment" that may be entitled to controlling weight include only licensed physicians, optometrists, and podiatrists; licensed or certified psychologists; and qualified speech-language pathologists.  20 C.F.R. § 404.1513(a).  Although the opinion is not entitled to controlling weight, the observations and opinions of a physical therapist can be used by the ALJ to determine the severity of a claimant's impairments and how they affect her ability to work, *see* § 404.1513(d) (allowing consideration of other medical-source evidence and defining "other sources" to include medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists and therapists).  As such, the ALJ was not required to give controlling weight to the physical therapist's opinion.

The regulations provide that the Commissioner will give controlling weight to a "treating source's opinion on the issue(s) of the nature and severity of your impairment(s)" if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" (20 CFR 404.1527(d)(2) and 416.927(d)(2)).  This provision is part of a subsection entitled "How we weigh medical opinions."   Thus, a treating source's opinion must be a medical opinion under this provision's "controlling weight" rule.

According to the regulations, a physical therapist's opinion is not a medical opinion. The regulations provide that "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s)..." (20 CFR 404.1527(a)(2) and 416.927(a)(2)).    Sections 404.1513(a) and 416.913(a) list five categories of "acceptable medical sources," none of which mentions physical therapists.  Instead, physical therapists would be considered in a different section, under "other sources" whose "[i]nformation ... may also help us to understand how your impairment affects your ability to work."  Because the regulations do not classify physical therapists as either physicians or "other acceptable medical sources,"   they cannot provide medical opinions.

There are no medical assessments in evidence from any treating source indicating that the claimant is disabled from all work.  The claimant testified that her doctor told her she would have to learn to live with her condition.

It was the opinion of the State agency reviewing physician that the claimant could lift and carry 25 pounds frequently and 50 pounds occasionally, stand and/or walk about 6 hours of a workday, sit about 6 hours of a workday, frequently climb, balance, kneel, and crawl, and occasionally kneel and crouch (Exhibit 10F).

None of the medical opinions submitted support the conclusion that Luna was disabled as a result of degenerative disc disease.   The ALJ did not err in her assessment of the medical opinions of Drs. Anchondo and Koshman, and their reference to functional overlay.  In light of the medical records submitted, the Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C.  Subjective Evidence of Pain

The third element to be weighed is the subjective evidence of pain, including the claimant's

23

testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render her disabled.  *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985).  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 860 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant.  *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).

At the administrative hearing, Luna testified about her health and its impact on her daily activities.  She offered no testimony or corroboration from her family or friends with respect to her complaints about her condition.   At the time of the administrative hearing, Luna was 42 years old (Tr. 256), and had a sixth grade education.  (Tr. 256).  She is fluent in Spanish, and cannot read or write in English.  (Tr. 256, 257).   According to Luna, she cannot stand for a long period of time. (Tr. 260).  Likewise, she estimated she could sit approximately 15 to 30 minutes.  (Tr. 260).  With

respect to her daily activities around her home, Luna testified that she cannot do light housekeeping because she cannot stand as a result of pain in her legs and back. (Tr. 260). However, Luna testified that she can dust a little and wash dishes. (Tr. 260). Luna testified that her husband does the grocery shopping and cooking. (Tr. 261). Luna testified that she watches television after she takes her pain medication, and that the pain medication makes her drowsy so she sleeps most of the time. (Tr. 261, 262). With respect to her grooming, Luna testified that her husband helps her put on her pants. (Tr. 263). Luna further testified that she does not attend church (Tr. 262) and does not travel to Guatemala or Mexico. (Tr. 262). Luna stated she has no hobbies. (Tr. 262). Luna testified that the pain is constant. (Tr. 264). Also, Luna testified that the pain medication causes dizziness, drowsiness, and nausea. (Tr. 264). In response to questioning by the ALJ about her ability to sit, stand and lift, Luna estimated she could lift two pounds. (Tr. 265). With respect to standing, Luna stated she could stand approximately five minutes before she would need to sit down. (Tr. 266). Luna testified she could walk about a block, and could sit for half an hour. (Tr. 266). According to Luna, she lies down at least three times a day. (Tr. 265). Luna estimated she has three good days a week. (Tr. 265). Based on the reasons which follow, the ALJ rejected Luna's testimony as not fully credible:

> In reaching a conclusion regarding the claimant's residual functional capacity, her subjective complaints and testimony were taken into consideration and evaluated in accordance with sections 404.1529 and 416.929 of Social Security Regulation Nos. 4 and 16 (20 CFR 404.1529 and 416.929) which incorporate Social Security Rulings 88-13(Cumulative Edition 1988) and 90-1p (Cumulative Edition, 1990-1991), restated and clarified in Social Security Ruling 96-7p.

> The claimant alleged disability due to low back pain with a history of back surgery. She was asked why she stopped working, and she responded that she had a lot of pain (Exhibit 1E). Factors for consideration in evaluating an individual's subjective complaints of pain include whether there is documentation of persistent significant limitations of range of motion, muscle spasm, muscular atrophy from lack of use,

significant neurological deficits, weight loss or impairment of general nutrition, and non-alleviation of symptoms by medication.  *Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988); *Adams v. Bowen*, 833 F2d 509, 512 (5th Cir. 1987); *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).  Although virtually all of the claimant's examinations revealed a markedly decreased range of motion of the spine, when the claimant was hospitalized in October 1999 for evaluation of a lump over the abdomen, it was reported that she had been "cleaning up the leaves at home" when she noticed increased pain apparently related to the lump (Exhibit 7F, page 2).  The fact that the claimant was able to clean up leaves suggests that the range of motion of the spine was not markedly decreased.  There is no evidence in the claimant's records of muscular atrophy, significant neurological deficits, weight loss or impairment of general nutrition.

The claimant testified that she could sit only 15 minutes, and she could not lift over 2 pounds.  She stated that she had to lie down during the day and had problems getting up because of her dizziness.  The claimant stated that her husband had to help her put on her pants.  It was her testimony that she had only 3 good days a week where she was not in bed most of day. She said that she did not eat, and she just slept from her medication.  The claimant testified that she did not do any household work, could not wash dishes, did not cook, did not go [to] the movies, and had no hobbies. She stated that she went to the grocery store with her husband and told him what to buy.  According to the claimant, he did all the cooking.  She stated that she watched television.

The claimant's testimony is essentially compatible with a person who is an invalid.  The claimant's testimony regarding functional limitations is not supported by objective clinical findings from examinations and tests.  She has not looked for a job.  Her testimony that she did not do any cooking but went to the grocery store with her husband to tell him what to buy does not appear consistent in that the cook is usually the one who knows what is [needed] to shop for.  Although the claimant indicated in her testimony that her activities of daily living were extremely limited, she told the physical therapist who performed the functional capacity that she enjoyed light exercise and walking during her free time (Exhibit 13F, page1).  Further, the Functional Capacity Evaluation report indicates that the claimant was functioning at a sedentary physical demand level (Exhibit 13F, page 3).  The claimant's testimony appears to be self-serving.  The undersigned had an opportunity to observe the claimant during the [course] of the hearing.  She did not appear to have any limitation in her ability to sit as she sat throughout the hearing.  The claimant was ambulating without any assistive devices.

Although the claimant complained that she just slept from her medication, her physical therapist commented that the claimant was taking medications, but they did not cause any drowsiness (Exhibit 13F, page 6).

The claimant testified that she could not understand English, but a medical report refers to the claimant as being bilingual (Exhibit 7F, page 2).

Drs. Anchondo and Koshman both expressed the opinion that there was a functional overlay. Dr. Anchondo stated that there was so much functional overlay that most likely there was malingering. The results of the consultative examinations by Dr. Gibson revealed evidence of three of five positive Waddell's tests, and the physical therapist reported that the claimant displayed several inconsistencies on her functional testing and possibly was a malingerer (Exhibit 13F, page 6). These multiple observations by medical health care professionals support a conclusion that the claimant's allegations are exaggerated.

Due consideration has been given to credibility, motivation, the objective medical evidence and opinion, clinical and laboratory findings, diagnostic tests, the extent of medical treatment and relief from medication and therapy, the claimant's daily activities, the extent, frequency, and duration of symptoms, attempts to seek relief from symptoms, the claimant's earnings record, and all of the evidence considered as a whole. The undersigned Judge finds that the claimant's subjective symptoms are of only a mild to moderate degree and tolerable for the level of work, residual functional capacity and work limitations as found herein, and the claimant's subjective complaints are found not to be credible but grossly exaggerated. (Tr. 30-31).

The Court finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that she weighed the testimony improperly. *See*: *Leggett v. Chater*, 67 F.3d 558, 565 n. 12 (5th Cir. 1995) ("It is appropriate for the court to consider the claimant's daily activities when deciding the claimant's disability status.") Based on this record, there are significant inconsistencies between Luna's subjective complaints and the objective medical evidence. The ALJ identified the inconsistencies and gave specific reasons for rejecting Luna's subjective complaints, such as her demeanor at the hearing, the lack of medical evidence to support her subjective symptoms, discrepancies in her statements in light of the medical evidence and prescribed medications. Accordingly, this factor also supports the ALJ's decision.

### D.  Education, Work History and Age

The fourth element to be weighed is the claimant's educational background, work history and present age.  A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that  Luna was forty-two years old at the time of the administrative hearing, and she attended school through the sixth grade in Guatemala and does not speak English.  Based on the objective medical evidence, the ALJ questioned Susan Rapant, a vocational expert, at the hearing about Luna's ability to to engage in gainful work activities.  The ALJ posed a series of comprehensive hypothetical questions to the Vocational Expert which incorporated all of Luna's exertional and non-exertional impairments.  The ALJ asked the Vocational Expert to consider the following hypothetical questions:

> Q.   And if I find that the claimant retains the ability to lift up to ten pounds frequently and five pounds occasionally and would be able to engage in often at sitting and standing for eight [hours] in a day, would you have an opinion regarding if she would be able to perform the past relevant work as described in the record?
>
> A.  As in the record I believe that she could do the past relevant work.
>
> Q.  Please assume the following hypothetical individual who has the same vocational profile as the claimant, that is the same age, that is a younger individual with a marginal education that was received in Guatemala, sixth grade level, Spanish speaking.  Is able to read and write in Spanish but is functionally illiterate in English and unable to speak English on a provision basis.  And such an individual would have the past relevant work as you've identified.  Please assume the following – would have a status post back surgery with a chronic pain symptomatology.  And such an individual would not be able to engage in stooping or bending activities and would be relegated to a light level of exertion.  Do you have any opinion regarding whether there would be any jobs available?
>
> A.  Yes, I believe there would be, your Honor.

Q.  Could you give some examples?

A.  A small products assembler, a sorter, a packager.

\*       \*       \*

Q.  Okay.  How many of these jobs that you've identified would be available in the regional and national economy and what do you mean by regional, explain that?

A.  Okay.  A small products assembler there is 1,100 in the area, 5,500 in the state and 205,000 in the nation.  A packager would be 1,000 in the area, 5,000 in the state and 195,000 in the nation.

Q.  Assume again the same hypothetical individual except this time such individual would be limited as Ms. Luna testified here today regarding her limitations.  Would that change your testimony regarding the jobs that you've just identified?

A.  Yes, it would, your Honor.

Q.   In what way?

A.  Based on her testimony her inability to lift over two pounds.  In the testimony that she only has three good days where she's not in bed most of the day.  Her testimony of the inability to stand or sit it appears from her testimony that she wouldn't be able to maintain eight hours of productivity–

Q.  Would there be any jobs consistent with that in a competitive setting?

A.  No, there would not.  (Tr. 269-271).

Luna's attorney was given the opportunity to question the vocational expert as follows:

Q.  Ms. Repant, based on the limitations contained in Exhibit 13F [the May 17, 2001, Functional Capacity Evaluation], would there be any competitive employment that would be performed?

A.  No, there would not.  (Tr. 272).

"A vocational expert is called to testify because of his familiarity with job requirements and

working conditions.  'The value of a vocational expert is that he is familiar with the specific

requirements of a particular occupation, including working conditions and the attributes and skills

needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert.  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)."  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  Here, as set forth above, the ALJ afforded Luna's representative this opportunity, and Luna's attorney questioned the Vocational Expert.

Upon this record, substantial evidence supports the ALJ's use of the grid rules and the ALJ's finding that Luna was not disabled.  The grid rules are used "when it is established that a claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect [her] residual functional capacity."  *Crowly v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999).  Here, the ALJ found that Luna did not have any significant non-exertional impairments that would affect her ability to perform sedentary work.  As such, the ALJ did not err in applying the grid rules.  Given Luna's vocational profile and residual functional capacity, substantial evidence supports the ALJ's conclusion that Luna was not disabled within the meaning of the Act and therefore was not entitled to benefits.  Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented.   Accordingly, this factor also weighs in favor of the ALJ's decision.

**V. Conclusion**

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Luna was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed. As such, the Court ORDERS that Plaintiff's Motion for Summary Judgment (Document No. 13) is DENIED, Defendant's Motion for Summary Judgment (No. 15) is GRANTED and the Commissioner's decision is AFFIRMED.

Signed at Houston, Texas, this 23rd of February, 2006.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE